JULIA VEATCH, Respondent, v. WABASH RAILROAD COMPANY, Appellant.

Kansas City Court of Appeals, June 6, 1910.

1. **NEGLIGENCE: Humanitarian Doctrine.** This is an action for death of plaintiff's husband. Under the evidence it is clear that deceased must have known of the approach of the train which struck him, and there was not sufficient evidence to warrant the submission of the question whether the engineer running said train knew, or should have known, that deceased would get into or remain in a place of danger. A verdict for plaintiff was therefore the product of mere conjecture or speculation, and cannot be upheld.

2. ———: ———. Though an injured person may get into a perilous place by his own negligence, it is still the duty of the defendant to use due care to save him, where the injured person is apparently unconscious of his peril. But an engineer seeing a man on the track ahead of him has the right to assume, until the contrary appears, that the man is observing due care for

his own safety and will step out of the way in time. An engineer is not required to whistle every time he sees a man on the track.

3. ————: ————: **Burden of Proof: Sufficiency of Evidence: Circumstantial Evidence.** In personal injury cases the burden is on the plaintiff to prove that the injury was the direct result of the negligence charged. The humanitarian doctrine has not affected this rule. Under that doctrine a plaintiff must affirmatively show that the person injured could have been saved if the defendant had exercised reasonable care to discover his peril and had made reasonable use of the means at hand to prevent such injury. Such omission of duty may be proved either by direct or circumstantial evidence, but not by conjecture or speculation.

4. **CONTRIBUTORY NEGLIGENCE: Error of Judgment.** A person walking beside a railroad track who assumes that he is safe from contact with moving trains, but is injured by his miscalculation of his distance, is guilty of contributory negligence.

5. **APPELLATE PRACTICE: Weight of Evidence.** In passing on defendant's demurrer to the evidence the appellate court rejects the evidence that is favorable to defendant.

Apppeal from Adair Circuit Court.—*Hon. Samuel Davis,* Judge.

REVERSED.

*J. L. Minnis, Higbee & Mills* and *Jones & Conkling* for appellant.

There is nothing shown in the record in this case to bring it within the humanitarian rule. There is nothing to show that deceased was in a position of peril; that he was unconscious of it; that the engineer was aware of his peril or by the exercise of ordinary care could have become aware of it in time to have averted his death. There is nothing shown in the conduct or actions of deceased to indicate to an ordinarily prudent person that deceased intended to leave a place of safety and venture across the track on which the train was running. Gumm v. Railroad, 125 S. W. 796;

Barnard v. Railroad, 126 S. W. 516; Kries v. Railroad, 148 Mo. 333; Morgan v. Railroad, 159 Mo. 282; Eppstein v. Railroad, 197 Mo. 733; Mokowik v. Railroad, 196 Mo. 570; Koegel v. Railroad, 181 Mo. 395.

*Campbell & Ellison* and *Lozier, Morris & Atwood* for respondent.

The court did not err in overruling the demurrer tendered by defendant at the close of all the evidence, as there was ample evidence tending to show actionable negligence on the part of defendant; hence the case was properly submitted to the jury. Fearsons v. Railroad, 180 Mo. 208; Morgan v. Railroad, 159 Mo. 262; Eppstein v. Railroad, 197 Mo. 720; Frye v. Railroad, 200 Mo. 400; Scullin v. Railroad, 184 Mo. 705; Chamberlain v. Railroad, 133 Mo. 587; Williams v. Railroad, 96 Mo. 275; Guenther v. Railroad, 95 Mo. 286; Guenther v. Railroad, 108 Mo. 18; Fiedler v. Railroad, 107 Mo. 645; LeMay v. Railroad, 105 Mo. 361; Lynch v. Railroad, 111 Mo. 601; Murrell v. Railroad, 105 Mo. App. 88; Kreis v. Railroad, 131 Mo. 533; Harlan v. Railroad, 65 Mo. 24; Frick v. Railroad, 75 Mo. 595; O'Mellia v. Railroad, 115 Mo. 221; Scoville v. Railroad, 81 Mo. 483; Hicks v. Railroad, 64 Mo. 439; Ayers v. Railroad, 190 Mo. 238; Sites v. Knott, 179 Mo. 708; Waddell v. Railroad, 213 Mo. 16; Ross v. Railroad, 113 Mo. App. 605; Waddell v. Railroad, 113 Mo. App. 685; Payne v. Railroad, 105 Mo. App. 160; Abbott v. Railroad, 121 Mo. App. 585; Jager v. Railroad, 114 Mo. App. 18; Feeney v. Railroad, 129 Mo. App. 429; Ahnefeld v. Railroad, 212 Mo. 281; Lynch v. Railroad, 208 Mo. 1; Smith v. Railroad, 129 Mo. App. 413; Schlereth v. Railroad, 115 Mo. 87; Kelly, Admr., v. Union Pacific, 125 S. W. 818; Hinzeman v. Railroad, 199 Mo. 56.

JOHNSON, J.—This action is prosecuted by Julia Veatch to recover damages for the death of her husband which she alleges was caused by the negligence of de-

fendant.  A trial before a jury resulted in a verdict and judgment for plaintiff in the sum of five thousand dollars, and the cause is here on the appeal of defendant.

The cause of action alleged in the petition and sought to be maintained by plaintiff in her evidence is negligence of defendant under what is termed the "humanitarian rule." The answer, in addition to a general denial, pleads other defenses, among them that of contributory negligence.  The principal contention of defendant is that the jury should have been peremptorily instructed to return a verdict for defendant.  Facts disclosed by the evidence of plaintiff pertinent to that contention thus may be stated:  The husband of plaintiff, Jacob J. Veatch, was struck and instantly killed by a passenger train on defendant's road at DeWitt in Carroll county. The train was a belated west-bound through passenger train which passed through DeWitt without stopping, about six o'clock in the morning of February 10, 1906.  Veatch, who lived on a farm three or four miles east of DeWitt, was on his way to the depot to board a local passenger train scheduled to leave at 6:20 that morning.  The railroad at and near the depot runs north and south and Veatch was walking south when he was overtaken by the locomotive of the through train at a point about eleven hundred feet north of the depot.  No witness introduced by plaintiff saw the death of the unfortunate man but a boy who attended to the switch lights found the body at about seven o'clock.  There were three tracks at this place. The one to the east was the "house track," the next was the main track, and the last the passing track.  The main line and house track were eight feet and two inches apart.  The through train ran south on the main line.  The body was discovered on the house track, the feet on or near the west rail, the head near the east rail and northeast of the feet.  It was still warm and frost on the rail near the mouth indicated that the stricken man had breathed after his body had rested

in that position.  A trail of disturbed ballast extending diagonally from the main track to the feet showed that the body had been dragged or projected along the cinders a distance of forty feet or more.  The left leg was broken between the knee and ankle; the scalp was lacerated on the back of the head; there was a severe abrasion on the right side of the face as though it had been dragged on the ballast and there were bruises on the shoulders, back and left arm.  Mr. Veatch was fifty-five years old.  He was in good health and his senses of sight and hearing were unimpaired.  He wore an overcoat and gloves.  His hat was lying between the main line and the house track.

The train ran through DeWitt at a speed of thirty or forty miles per hour.  The locomotive carried an electric headlight of high power and the main line ran on a tangent a distance of 3870 feet north of the depot. There were no obstructions to vision, and, therefore, there was nothing to prevent the engineer from seeing the pedestrian when he was over two thousand feet ahead of the engine, nor was there any reason for the pedestrian not seeing or hearing the approaching engine, except the fact that he was walking with his back to it.  The train consisted of a locomotive and six or eight coaches.  As it rushed through the switch yards, the engine sounded danger signals but no effort was made to stop.  An ordinary stop could have been made in eight hundred feet and an emergency stop in half that distance.  There were two road crossings north of the depot, the one farthest north being about eighteen hundred feet from the depot.  Many people were in the habit of using the railroad tracks as a passageway between these crossings and the depot.  The evidence tends to show that no warning bell or whistle was sounded except the danger signal which was given at the time of the injury.

The engineer, introduced as a witness by defendant, testified that he whistled for the road crossing and rang

the bell. As he rounded the curve, he saw the deceased about even with the crossing walking between the main track and the passing track. "When I whistled for the first crossing, he stepped to the west about one foot and was walking on the ends of the ties of the passing track." This put Veatch in the clear, and he continued to walk on the ends of the ties of the passing track until the engine reached the road crossing. Then the engineer pulled in his head from the window to whistle for the next crossing. He testified: "Q. What did you see at that time or about that time? A. After I got hold of the whistle to whistle for the Jefferson street crossing, I seen him stepping over to the main line. Q. What did you do? A. Whistled the stock alarm, three or four short blasts, and he made a jump to the left or to the east. Q. Where would that put him with reference to the main track on which the train was running when he made the jump? A. Put him to the east or left of the main track. Q. How far east of it with reference to being struck by the train? A. I considered it in perfect safety."

By the Court: "Tell where he was with reference to you, straight out or to the front part of your train? Where was the man when he jumped? Where would that place him? A. He was about one hundred or one hundred and fifty feet ahead of me. By the Court: Q. Whereabouts on the track? A. Placed him just stepping over the west rail of the main track. Q. That is when you first saw him? A. Yes, sir. Q. You said something about the jump, when he jumped where did it place him? A. Jumped to the left or east toward the house track. Q. Where did that place him with reference to the main track? A. After he jumped and got toward the passing track placed him clear of the main track."

On cross-examination: "Q. You sounded the station whistle where? A. Just as I rounded the curve. Q. What indication, if any, did he give of hearing that

signal?    A.  None when I whistled the station whistle.
Q.  Continued walking south, did he not?  A.  Yes, sir.
Q.  How far had Mr. Veatch traveled between the time
you rounded the curve and sounded the station whistle
and the time you sounded the whistle for the Duncan
crossing?  A.  I could not say how far  he  walked.
Q.  He was walking slowly, was he not?  A.  Moved
along at the ordinary rate of speed for walking."

If the testimony of the engineer is to be believed,
the deceased met his death by his own fault or sudden
confusion, and not on account of any negligence of the
engineer, but in considering the demurrer to the evi-
dence, we shall reject the testimony of the engineer ex-
cept insofar as it may favor the contention of plaintiff
and shall turn to the facts and circumstances adduced
by plaintiff to ascertain if they will support a reasona-
ble inference that the death of her husband was due
to a breach of duty on the part of the engineer.

In personal injury cases, the burden is always on
the plaintiff to prove that the injury was the direct re-
sult of the negligence alleged.    The   principles   and
rules of the "humanitarian doctrine" have not affected
this rule and it is incumbent on the plaintiff in this
case to show affirmatively that the death of her husband
was caused by the failure of the engineer to exercise
reasonable care to discover his peril and  to   make
reasonable use of the means at hand to avoid injuring
him.  Plaintiff is not required to prove such omission
of duty by direct evidence but she is required to *prove*
it, either by direct or circumstantial evidence and not
to leave the inference of its existence to guess work or
speculation.

Of the negligence of the unfortunate man there can
be no question.  It was his business to be on the lookout
for a train.  He must have known it was coming from
the time it rounded the curve over twenty-five hundred
feet away, since from that time, he was bathed in the
glare of an arc headlight.    It was a still night; the

headlight enveloped him with light as bright as daylight; there were no obstructions to sight or hearing; his senses were unimpaired, and it would be unreasonable to think that he did not know of the approach of the train. The place where he was found, the position of his body and the nature of his wounds indicate that when he was stricken he was not on the track, but to one side of it, and almost in the clear. Evidently some projecting part of the train, such as the end of the pilot beam must have struck him a glancing blow that hurled him off to the side. Either he had been walking on the track and waited too long before starting to get off, or he was walking in the path between the main line and the house track and failed in his calculations to allow enough space to the train to put him in the clear. In either case, his negligence is indisputable and it was either the sole or contributing cause of his peril.

Invoking the rule that "though the deceased by his own negligence had placed himself in a perilous position on the railroad track, it was still the duty of the engineer to have avoided striking him if he could have done so after the danger became apparent." [Schlereth v. Railroad, 115 Mo. 87.] Counsel for plaintiff argue that the engineer had a clear view of the peril of plaintiff's husband for a distance of over twenty-five hundred feet and, therefore, had ample opportunity to save him either by stopping the train or sounding a warning.

In each of the numerous cases cited by counsel in support of this argument, there was something in the appearance of the endangered person or in the peculiarities of the situation to suggest to a reasonably careful and prudent person in the position of the engineer that there was danger and that the person threatened was unconscious of his peril. Thus in Smith v. Railroad, 129 Mo. App. 413, an aged negro was walking on the track on a cold morning with his face to the oncoming train. He stooped as he walked and his head was wrapped up in a "comforter." We held the inference

was reasonable that the appearance of the old man would have suggested to an ordinarily careful, prudent person in the position of the engineer that he was unconscious of his peril which consisted solely of his ignorance of the fact that the train was coming. But the facts of the present case, even in their most favorable aspect to plaintiff's contention differ vitally from those of any of the cases relied on by plaintiff. Here there was nothing in appearances even to hint that there was any peril. The mere fact that the man was walking on or near the track afforded no suggestion of danger. Whether or not the tracks were customarily used by pedestrians did not affect the right of the engineer to assume, until the contrary appeared, that the man was observing due care for his own safety and would step out of the way in time. The appearances offered nothing at variance with that presumption. The man was healthy and vigorous, in full possession of normal faculties and was unhampered and unobstructed. As we observed before, he must have known that the train was coming and there is no evidence that the engineer should have apprehended the presence of danger before he did. To affirm the judgment in this case would compel us to say that an engineer seeing a pedestrian walking on the track ahead had no right to assume that he is looking out for himself and will step out of the way, but must act on the opposite presumption by giving signals and preparing to stop. The "humanitarian doctrine" does not go to that length and no good reason is apparent for giving it any greater scope than it now has. To say that an engineer must whistle every time he sees a man on the track would be unreasonable and that is just what we would have to say if we gave sanction to the contention of plaintiff The verdict in this case was the product of mere conjecture and speculation and we cannot suffer it to stand.

The judgment is reversed.    All concur.