Kunnemeyer v Long Is. R.R. (2021 NY Slip Op 07281)





Kunnemeyer v Long Is. R.R.


2021 NY Slip Op 07281


Decided on December 22, 2021


Appellate Division, Second Department


Wooten, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 22, 2021
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

HECTOR D. LASALLE, P.J.
LEONARD B. AUSTIN
PAUL WOOTEN
JOSEPH A. ZAYAS, JJ.


2018-12287
 (Index No. 48032/09)

[*1]Benjamin Kunnemeyer, appellant, 
v
Long Island Railroad, etc., respondent, et al., defendant.



APPEAL by the plaintiff, in an action to recover damages for personal injuries, from a judgment of the Supreme Court (Sanford Neil Berland, J.), entered April 5, 2018, in Suffolk County. The judgment, upon a jury verdict in favor of the defendant Long Island Railroad on the issue of liability, is in favor of that defendant and against the plaintiff dismissing the complaint insofar as asserted against that defendant.



Bisogno & Meyerson, LLP (Law Office of Judah Z. Cohen, PLLC, Woodmere, NY, of counsel), for appellant.
Stephen Papandon, Jamaica, NY (Andrew Muccigrosso of counsel), for respondent.



WOOTEN, J.


OPINION & ORDER
For more than a century, New York courts have recognized the so-called "open run" defense, which permits a train engineer who sees a person on or near the tracks ahead to assume, under certain circumstances, that the person will notice the oncoming train and leave the tracks in time to avoid an accident. When the open run defense is applicable, the engineer has no duty to make an emergency stop unless he or she determines that the person cannot or will not leave the tracks. The novel issue raised on this appeal is whether the open run defense is applicable only when the train is operating "in broad daylight" (PJI 2:176). We hold that the defense is not so limited, and may be applicable under any circumstances in which an oncoming train would be readily observable to a person on or near the tracks making reasonable use of his or her senses.
I. Factual Summary
A. Circumstances of the Accident
In late May 2009, the then 30-year-old plaintiff was living in a supportive housing facility located in Patchogue for individuals with a history of substance abuse. At that time, the plaintiff was taking prescribed Suboxone for the treatment of opioid addiction once every day in the morning. According to the plaintiff's testimony, he was aware that he should not consume alcohol while taking Suboxone because "it could intensify the effects."
The plaintiff testified that on May 28, 2009, he "got into a very bad argument with [his] girlfriend." On May 29, 2009, at approximately 9:00 a.m., the plaintiff woke up and took Suboxone. The plaintiff, "want[ing] to feel numb" because he thought his relationship with his girlfriend "was ending," purchased seven 1 mg pills of Xanax at approximately 12:00 to 12:30 p.m., and took all of the pills at that time. Later that day, at approximately 4:00 to 5:00 p.m., the plaintiff purchased a 24-ounce can of malt liquor beer, which is beer with high alcohol content. At approximately 7:30 to 8:00 p.m., the plaintiff opened the can of malt liquor beer and started to drink it. At approximately 10:00 to 10:30 p.m., the plaintiff went to a McDonald's restaurant for food, at [*2]which time he felt the Xanax was "wearing off." The plaintiff had not finished his malt liquor beer, and drank more of it in the bathroom at McDonald's.
After staying at McDonald's for approximately 30 to 45 minutes, the plaintiff left and started walking toward the housing facility on a path that required him to cross from the north side of the railroad tracks that run along Robinson Boulevard in Patchogue to the south side of the tracks to reach Hewlett Avenue. The plaintiff testified that before crossing the tracks, he decided not to return to the housing facility to avoid "them . . . smell[ing] beer on [his] breath[ ]." Instead, the plaintiff walked westward along the north side of the tracks to meet some "beer drinkers in the neighborhood" with whom he planned to "finish [his] beer."
On May 29, 2009, at approximately 10:38 p.m., a train operated by the defendant Long Island Railroad (hereinafter the LIRR), left Montauk at the start of its route on the "Montauk line" and headed toward the Jamaica station. The train crew included Peter Cardone, the engineer, Alfred Bukofsky, the brakeman, and Michael Panzica, the conductor. While traveling westbound, Cardone was in the engineer's compartment of the cab car, from which he could look through a window at the tracks ahead.
On May 30, 2009, at approximately 12:24 a.m., the train was at the Bellport station. After leaving the Bellport station, the train proceeded west toward the Patchogue station, and entered a restricted speed area requiring the train to move no faster than 40 miles per hour.
At approximately 12:40 a.m., the train was moving at approximately 39 miles per hour as it neared a crossing east of the Patchogue station for vehicles driving on Conklin Avenue to pass over the tracks. Panzica and Bukofsky were in the engineer's compartment of the cab car in close proximity to Cardone. According to Cardone's testimony, since it was "dark and foggy," the train's headlights were turned on and set to "bright." At that time, Cardone observed what "appeared to be a person laying down," who would later be identified as the plaintiff, on the south side of the tracks no farther than two car lengths ahead. At approximately the same time, Panzica and Bukofsky first observed the plaintiff.
As soon as he observed the plaintiff, Cardone sounded the horn and "dumped the train, which is railroad vernacular" for triggering an emergency stop. The plaintiff, who was lying on his back near the tracks with one leg extended over the rails, did not move. The train was not able to stop in time and struck the plaintiff. Once the train came to a stop, Cardone walked along the south side of the tracks and located the plaintiff by the fifth car. Cardone then spoke with the plaintiff, who was conscious and able to communicate his name and age.
After the plaintiff was transported to a hospital, he tested positive for the presence of marijuana and Benzodiazepine, and had a blood alcohol content of 0.081%.
In December 2009, the plaintiff commenced this action to recover damages for personal injuries against the LIRR and the Metropolitan Transportation Authority (MTA) (hereinafter the MTA). The plaintiff alleged, inter alia, that the operator of the train "failed to keep a proper lookout" or to "timely . . . sound the horn . . . and apply the brakes," and that "members of the train crew were in the engineers cabin at the time of the incident and . . . distracted the engineer from his duties."
B. The Trial
In October 2017, the Supreme Court conducted a jury trial on the issue of liability. During the trial, the plaintiff discontinued the action insofar as asserted against the MTA, leaving the LIRR as the sole defendant.
At trial, the plaintiff presented testimony from himself, Bukofsky, Cardone, Panzica, a meteorologist, Michael Merin, and two expert witnesses on lighting, Carl Everett and Carl Berkowitz.
The train crew, Bukofsky, Cardone, and Panzica, consistently testified that as soon as the plaintiff came into view on the tracks ahead, they simultaneously cursed and Cardone immediately sounded the horn and "dumped the train." Bukofsky, Cardone, and Panzica also testified that it was foggy at the time of the accident, which Cardone stated impeded his "long range vision." However, Bukofsky acknowledged "it was a high fog" that was not at the level of the train or the tracks, and Panzica conceded that "fog was not an issue" with visibility when he looked out the front window of the train. Further, Merin, the meteorologist, testified that at the time and location of the accident, there was "only mist," which would allow for visibility of at least a half mile.
The expert witness Everett testified that federal regulations mandated the use of [*3]headlights with a brightness of 200,000 candelas each, which are capable of illuminating an object up to 800 feet away. Berkowitz and Bukofsky both testified that the tracks were straight, without any curves, in the area of the accident. Everett further stated that he and the expert witness Berkowitz conducted a test with two train headlights matching the regulations raised to approximately six feet above the ground in the area where the accident occurred between 11:30 p.m. to 12:30 a.m. The expert witnesses verified that the light illuminated a person up to 800 feet away. Berkowitz did not attribute the accident to a lack of visibility, but rather opined that "an attentive crew would have seen [the plaintiff] much sooner."
The LIRR presented testimony from, among others, James Shiminski, road foreman of engines for the LIRR. Shiminski testified that the train moved a distance of 515 feet before coming to a complete stop after the emergency stop was triggered, which took approximately 16 seconds.
Following the close of evidence, the Supreme Court conducted a charge conference outside the presence of the jury. During the conference, the court indicated that it intended to charge the jury with a modified version of the pattern jury instructions for the "open run" defense (see PJI 2:176). The court read to the attorneys the charge as written in the pattern jury instructions, as follows:
"In deciding whether the railroad exercised due care, you should bear in mind that a train engineer, who sees a person on or near the tracks in broad daylight, is not bound to stop the train immediately but has the right to assume the person will see and hear the train and heed the danger and leave the tracks."
The court informed the attorneys that it intended to omit the words "in broad daylight" from the charge, since "[t]he [accident] happened at night." The court stated that:
"[t]he concept of whether or not a person who's on the track can see a train in broad daylight and be able to make a decision . . . of the danger, is, in my opinion, no different than a person on the track at night who would be able to perceive the danger just as well . . . as he could in the day because of lights, because of the rumbling of the train, because of the noise of the train."
The plaintiff's attorney objected to the Supreme Court's ruling, stating, "out of all the cases that we've . . . seen that apply to the open run rule, they all happened at daytime." The plaintiff's attorney requested that the court either not issue the charge, or if it decided to issue the charge, to include the words "in broad daylight" and "[l]et the jury make a determination what to do with that." The court adhered to its ruling.
After the jurors returned to the courtroom, the attorneys delivered their summations. During the summation of the LIRR's attorney, she argued, inter alia, that "[a]s soon as the[ train crew] saw [the plaintiff], they reacted," and that Cardone's visibility "was cut down because of . . . the foggy conditions." During the summation of the plaintiff's attorney, he asserted, among other things, that the train crew was "not paying attention in that cabin," and that the fog "was not an issue" due to the "powerful headlight[s]."
Following the summations, the Supreme Court charged the jury, as follows:
"In deciding whether the railroad exercised due care, you should bear in mind that a train engineer who sees a person on or near the track is not bound to stop the train immediately, but has the right to assume that the person will see and hear the train, heed the danger and leave the track.
"In such a situation, the engineer has no duty to make an emergency stop until he or she determines that the person cannot or will not leave the area on the track."
The jury returned a verdict finding that the LIRR was not negligent. Although the verdict sheet did not require the jurors to answer any additional questions if they found the LIRR was not negligent, the jurors proceeded to answer the remaining questions. The Supreme Court stated on the record that the jurors also found, inter alia, that the plaintiff was negligent, that the plaintiff's negligence was a substantial factor in causing the accident, and that the plaintiff was 100% at fault and the LIRR was 0% at fault.
On April 5, 2018, the Supreme Court entered a judgment in favor of the LIRR and [*4]against the plaintiff dismissing the complaint insofar as asserted against the LIRR. The plaintiff appeals, arguing that the court erred in omitting the words "in broad daylight" from the jury charge on the open run defense.
II. Overview of the "Open Run" Defense
Under New York jurisprudence, the so-called "open run" defense can be traced back to an 1887 decision by the Court of Appeals in Chrystal v Troy & Boston R.R. Co. (105 NY 164), although there are earlier mentions of the defense in other states (see e.g. Lake Shore & M.S. Ry. Co. v O'Conner, 115 Ill 254, 261-262, 3 NE 501, 503; Bell v Hannibal & St. J.R. Co., 72 Mo 50, 62).
Although Chrystal has been cited on numerous occasions, the circumstances of the accident in that case are unusual among decisions addressing the open run defense. In that case, the injured plaintiff was a 17-month-old infant, who allegedly was left to nap on the floor inside his home, and left the home without his mother's awareness while she was in another room. The child made his way onto train tracks near the home, and was struck by an oncoming train which was unable to stop in time. Following a jury trial, a verdict was rendered in favor of the plaintiff. On the defendant's appeal from the ensuing judgment, the Court of Appeals reversed the judgment and directed a new trial. The Court determined that "there can be no doubt, upon this evidence, that after the engineer discovered that the child was in peril he did all he could to arrest the motion of the train" (Chrystal v Troy & Boston R.R. Co. 105 NY at 170). The evidence at trial showed that after a girl "ran from the track, [the engineer] for the first time [observed the injured plaintiff] and immediately gave the signal for the brakes to be applied and reversed his engine" (id. at 169). Thus, there is no indication in Chrystal that the engineer declined to take immediate action due to an assumption that the injured plaintiff would leave the tracks in time. Nevertheless, the Court stated, in dicta, that "[a]n engineer is not bound to stop his train the moment he sees some living object upon the track" (id. at 170), and "has the right, in broad daylight, when his train is perfectly visible and its approach must be heard and known, at least in the first instance, to assume that the object, whatever it is, will leave the track in time to escape injury" (id. [emphasis added]). The Court did not indicate that its use of the phrase "in broad daylight" was intended to set forth the only circumstances in which the principle could be applied, as opposed to highlighting the particular facts of that case. Indeed, the Court made other statements applicable to the particular facts of that case, including that "[the engineer] is not bound to expect helpless infants upon the track without sufficient knowledge or ability to escape when warned of danger" (id.), and "[the engineer] could not know when he first saw the plaintiff that he was too young to be conscious of the danger to which he was exposed" (id.).
The Court of Appeals subsequently repeated the principle set forth in Chrystal in other cases involving daytime accidents, stating that an engineer has the right to assume that a person observed on the tracks "in broad daylight, when his train is perfectly visible," will move away from the tracks in time to escape injury (see e.g. Kretik v New York Cent. R.R. Co., 227 NY 474, 477-478; O'Brien v Erie R. Co., 210 NY 96, 100).
In a 1931 decision, Fierro v New York Cent. R.R. Co. (256 NY 446), the Court of Appeals repeated this principle, without using the phrase "in broad daylight." Specifically, the Court stated that "a locomotive engineer, seeing a person on the track at a time when his train is perfectly visible, may assume that such person will leave the track in time to escape injury and, without imputation of negligence, may continue his run until he discovers that the person is heedless of danger" (id. at 449 [emphasis added]). While the decision in Fierro reflects that the accident occurred at 9:00 a.m., there is no indication that the occurrence of the accident at daytime was the determinative factor in the Court's determination to reverse a judgment in favor of the plaintiff. Rather, the Court noted that the plaintiff's decedent, an employee of the railroad company, was the only one of several workers who failed to "hear[ ] and heed[ ] the warning" (id. at 448) provided by a watchman who blew a whistle to indicate an oncoming train, and that the plaintiff's own witnesses acknowledged that "nothing prevented the decedent from seeing the train" (id.).
In Guller v Consolidated Rail Corp. (242 AD2d 283), this Court recited the defense, including the phrase "in broad daylight," when addressing a daytime accident. However, this Court determined that the defendant rail company "should not be held liable for the plaintiff's failure to take heed of the oncoming diesel train, which was readily observable by the normal use of one's senses" (id. at 284 [emphasis added]).
In Vadell v Long Is. R.R. Co. (6 AD2d 88), the Appellate Division, First Department, applied similar reasoning to a nighttime accident involving an automobile struck by a train. The [*5]Court stated "[t]he engineer had every right to assume that an automobile approaching the grade crossing would observe the danger signals at the crossing and bring his vehicle to a stop before it reached the tracks" (id. at 90-91). The Court noted that evidence was presented at trial that red flasher lights at the railway crossing where the accident occurred were functioning at the time of the accident, and there was nothing to obstruct the driver's view in the direction from which the train was coming.
Further, in Leone v CSX Transp., Inc. (2008 WL 828125, *3, 2008 US Dist LEXIS 24455, *9 [ND NY, No. 5:06-CV-0389 (NAM/GJD)]), the United States District Court for the Northern District of New York discussed the open run defense in a case involving a nighttime accident in which a train struck a person lying down on the tracks in "a dark area." The District Court recited the open run defense as articulated in PJI 2:176, with the inclusion of the phrase "in broad daylight." The District Court then reasoned that since the open run defense provides that an engineer "has no duty to make an emergency stop until he or she determines that the person cannot or will not leave the area on the track" (2008 WL 828125, *6, 2008 US Dist LEXIS 24455, *17), it follows that "a train operator may only be found negligent if he or she sees a person on the tracks 'from such a distance and under such other circumstances as to permit him [or her], in the exercise of reasonable care, to stop before striking the person'" (2008 WL 828125, *6, 2008 US Dist LEXIS 24455, *17, quoting Coleman v New York City Tr. Auth., 37 NY2d 137, 140). Relying on that principle, the District Court determined, inter alia, that there was no evidence presented that a train engineer has any obligation to reduce speed "upon seeing an unidentified obstruction on the tracks" (2008 WL 828125, *9, 2008 US Dist LEXIS 24455, *30), or that the train operators either "ignored or failed to heed indications that the obstruction they saw on the tracks was a person" (2008 WL 828125, *9, 2008 US Dist LEXIS 24455, *28) or "could have or should have" sounded the horn sooner (2008 WL 828125, *10, 2008 US Dist LEXIS 24455, *32).
Notwithstanding the foregoing, there is a paucity of New York decisions discussing the application of the open run defense to train accidents that occurred at night. Nevertheless, some courts in other states have recognized that the operator of a train involved in an accident that occurred at night—or that did not occur in broad daylight—had the right to assume an individual on the tracks would move out of the way in time to avoid an accident.
For instance, in Matteson v Southern Pac. Co. (6 Cal App 318, 92 P 101), the plaintiffs' decedent was injured when she stepped in front of and was struck by a train in January after 6:00 p.m. Testimony was elicited from witnesses that it was either "dark [or] dusk" (6 Cal App at 321, 92 P at 103 [internal quotation marks omitted]) at the time of the accident, and testimony was elicited from the decedent that "[i]t was dark but light enough so that I could see the train" (6 Cal App at 321, 92 P at 103 [internal quotation marks omitted]). At trial, the Superior Court instructed the jury that the train operators "had a right to assume that [the decedent] was in possession of her faculties and would retain her place of safety and not recklessly expose herself to danger" (6 Cal App at 327, 92 P at 106). The jury rendered a verdict in favor of the defendant railway company, and on appeal, the Court of Appeal for the Third District of California affirmed the ensuing judgment.
Further, in Veatch v Wabash R. Co. (145 Mo App 232, 238, 129 SW 404, 406), the plaintiff's decedent was struck by a train on "a still night." The Kansas City Court of Appeals of Missouri stated that the victim was "bathed in the glare of an arc headlight . . . as bright as daylight" (145 Mo App at 238-239, 129 SW at 406). The court held that "[t]o affirm the judgment [in favor of the plaintiff] would compel us to say that an engineer seeing a pedestrian walking on the track ahead had no right to assume that he is looking out for himself and will step out of the way" (145 Mo App at 240, 129 SW at 406), which "would be unreasonable" (145 Mo App at 240, 129 SW at 406).
Also, in Grinestaff v New York Cent. R.R Co. (253 Ill App 589, 592), the plaintiff was injured when his automobile was struck by a train at a railway crossing "in the nighttime and in the dark." The Appellate Court of Illinois, Third District, held that the train operator "was not required to stop the train so soon as he saw [the plaintiff] upon the track, but had the right to assume at that time [that the plaintiff] would act as a reasonably prudent man and leave the track[s] to avoid being run over by the moving train" (id. at 607 [internal quotation marks omitted]).
Lastly, in Devance v Missouri, K. & T. Ry. Co. of Texas (164 SW 13), the Court of Civil Appeals of Texas at Dallas invoked a similar principle to the open run defense with respect to an accident involving a victim struck by a train at night while lying down on the track. The court noted that "[t]he night in question was foggy and dimmed the headlights of the engine to some [*6]extent" (id. at 13). Nevertheless, the court determined that based on the evidence presented, the engineer was keeping a lookout "and saw nothing to indicate there was a human being on the track until too late to prevent the accident" (id. at 14). Thus, the court held that the engineer "had the right to assume that no one would be" lying on the tracks (id.).
III. Analysis
Contrary to the plaintiff's contention, we hold that the open run defense is not exclusively limited to cases involving daytime train accidents, but rather may be applicable under any circumstances in which an oncoming train would be readily observable to a person on or near the tracks making reasonable use of his or her senses.
Although the phrase "in broad daylight" has frequently been repeated since it was first used by the Court of Appeals in Chrystal, the decision in Chrystal discloses no intent to limit the defense exclusively to daytime accidents. Rather, it is apparent from the decision that the Court included the words "in broad daylight" to highlight a fact relevant to the more critical language that follows, "when [the] train is perfectly visible and its approach must be heard and known" (Chrystal v Troy & Boston. R.R. Co., 105 NY at 170). Indeed, the only possible relevance of the phrase "in broad daylight" is with regard to the visibility of the oncoming train. However, it is not difficult to envision a scenario in which a train operating "in broad daylight" would not be "perfectly visible" to someone on the tracks, such as when an oncoming train is coming around a sharp curve in the tracks. A train operating in the middle of the afternoon could also be difficult to see approaching, for instance, during a snowstorm. To assign significance to the time of day when the accident occurred, without regard to visibility, would create an arbitrary rule. Further, a train operating at night could be "perfectly visible" to someone on the tracks, such as when the oncoming train is displaying bright headlights on tracks without a curve. Moreover, the time of day could not possibly affect whether "[the train's] approach [would] be heard," as there is no reason to believe a train's horn would sound any louder during than the day than at night (id.).
That the critical portion of the open run defense articulated in Chrystal was the visibility of the train, and not the phrase "in broad daylight," is further evidenced by the Court of Appeals' decision in Fierro, which did not even mention the phrase "in broad daylight." Rather, the Court in Fierro stated that "a locomotive engineer, seeing a person on the track at a time when his train is perfectly visible, may assume that such person will leave the track in time to escape injury" (Fierro v New York Cent. R.R. Co., 256 NY at 449 [emphasis added]). While the reference to "time" could be construed as pertaining to the time of day, the Court did not so specify. Indeed, neither the Court of Appeals nor any New York Appellate Court has ever held that the open run defense is inapplicable simply because an accident occurred at night, and we decline to recognize such an arbitrary rule. Rather, we hold that the applicability of the open run defense is fact specific, and must be evaluated based on the particular circumstances of each case.
Under the particular circumstances of this case, the issuance of a charge on the open run defense was appropriate (see Alba v Long Is. R.R., 204 AD2d 143). At trial, the plaintiff presented testimony that the train's headlights were functioning at the time of the accident and set to bright; that the headlights were capable of illuminating a distance of up to 800 feet; that the tracks did not curve in the vicinity of the accident; and that the engineer immediately sounded the horn when he observed the plaintiff. Although testimony was elicited that it was foggy when the accident occurred, Bukofsky stated "it was a high fog" that was not at the level of the train or the tracks, and Panzica stated that "fog was not an issue" with visibility. Indeed, the plaintiff's own attorney argued during summation that fog "was not an issue" due to the "powerful headlight[s]." Thus, the evidence was sufficient to support a finding that the oncoming train would have been noticed by anyone on the tracks making proper use of his or her senses.
Furthermore, contrary to the plaintiff's contention, we hold that it was appropriate for the Supreme Court to issue a modified jury charge on the open run defense which was tailored to the facts of this case by omitting the words "in broad daylight" (see Green v Downs, 27 NY2d 205, 208). "[T]he Pattern Jury Instructions are only intended as a guide to the Trial Justice," and need not be strictly adhered to (Spadaccini v Dolan, 63 AD2d 110, 117; see Williams v Bright, 230 AD2d 548, 556). "'A trial court is required to state the law relevant to the particular facts in issue, and a set of instructions that confuses or incompletely conveys the germane legal principles to be applied in a case requires a new trial'" (Gorokhova v Consolidated Edison of N.Y., Inc., 186 AD3d 1201, 1202 [emphasis added], quoting J.R. Loftus, Inc. v White, 85 NY2d 874, 876). Here, given that the accident occurred at night, issuing the charge exactly as written in the pattern jury [*7]instructions, with the words "in broad daylight," would have had significant potential to confuse the jurors. Moreover, since the court otherwise adhered to PJI 2:176, the charge as given "substantially complied" with the pattern jury instructions (Spensieri v Lasky, 94 NY2d 231, 239; see Hubbard v New York State Off. of Mental Health, Cent. N.Y. Psychiatric Ctr., 192 AD3d 1586, 1590).
Consequently, under the circumstances of this case, the Supreme Court did not err in charging the jury on the open run defense without including the phrase "in broad daylight."
In any event, even assuming, arguendo, the jury charge as given was improper, any error arising from the charge was harmless, as the result would have been the same if the alleged error had not occurred (see CPLR 2002; Simon v Granite Bldg. 2, LLC, 170 AD3d 1227, 1233). Here, the plaintiff did not contest the consistent testimony of the train crew that Cardone sounded the horn and "dumped the train" as soon as he observed the plaintiff on the tracks. Rather, the plaintiff's contention at trial was that the train crew was "not paying attention" and should have noticed the plaintiff sooner. Since the plaintiff did not ask the jury to find that the engineer waited to take action when he first spotted the plaintiff, there is no basis to speculate that the jury verdict was influenced by the open run defense. Moreover, the jury verdict further evidences that the jury found the accident was attributable to the plaintiff's own negligence in lying down on the tracks, as the jury found the plaintiff 100% at fault in the happening of the accident.
Accordingly, the judgment is affirmed.
LASALLE, P.J., AUSTIN and ZAYAS, JJ., concur.
ORDERED that the judgment is affirmed, with costs.
ENTER:
Maria T. Fasulo
Clerk of the Court